**Carmine ESPOSITO, Defendant,**

**v.**

**John ADAMS, United States Marshal for the Northern District of Illinois, Respondent.**

No. 87 C 5063.

United States District Court, N.D. Illinois, E.D.

Oct. 5, 1988.

**1472**

Philip C. Parenti, Chicago, Ill., for defendant.

Thomas A. Scorza, Asst. U.S. Atty., for respondent.

## MEMORANDUM OPINION AND ORDER

ROVNER, District Judge.

### I. INTRODUCTION

Before the Court is a petition for habeas corpus brought by Carmine Esposito.[1] On March 12, 1987, the petitioner was arrested pursuant to a magistrate's warrant issued in connection with a Republic of Italy request for his provisional arrest. At the time of his arrest, the petitioner claimed that he was John Michael Phelan. Based on the evidence presented at an identity hearing on March 13, 1987, the magistrate found that the petitioner's true name was Carmine Esposito. On April 17, 1987, Italy formally requested the extradition of the petitioner pursuant to the 1983 extradition treaty between the United States and the Republic of Italy[2] (the "Treaty") for the crimes of murder, attempted murder, and complicity in murder. Italy also sought Esposito's extradition for a conviction in absentia of extortion. The magistrate held an extradition hearing on April 22 and 23, 1987, pursuant to 18 U.S.C. § 1384 and

Local General Rule 1.70(b)(1)(j). On June 12, 1987, the magistrate ruled that he had jurisdiction over the subject matter and the person of the defendant; that the extradition treaty was applicable and complied with; and that there existed probable cause to believe that the petitioner committed the acts alleged in the extradition request. The cause comes before the Court on the petitioner's request for the issuance of a writ of habeas corpus to prevent his extradition.

In his petition, Esposito makes the following arguments: first, that the government's evidence was insufficient to establish probable cause that he committed the crimes stated in the extradition complaint; second, that his due process rights were violated during his post-arrest questioning; third, that the documentary evidence produced at the extradition hearing was inadmissible because it was improperly certified; fourth, that the Italian criminal justice system does not provide adequate safeguards to the accused.

### II. SCOPE OF REVIEW

■ Jurisdiction of this action results from the federal habeas corpus statute, 28 U.S.C. § 2241, and numerous decisions holding that review of the order of extradition and commitment is not available by direct appeal, but is subject to limited review by means of habeas corpus. *E.g., Collins v. Miller,* 252 U.S. 364, 369, 40 S.Ct. 347, 349, 64 L.Ed. 616 (1920); *Eain v. Wilkes,* 641 F.2d 504, 508 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *In the Matter of Assarsson,* 635 F.2d 1237, 1240 (7th Cir.1980), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 325 (1981).

In *Fernandez v. Phillips,* 268 U.S. 311, 45 S.Ct. 541, 69 L.Ed. 970 (1925), Justice Holmes set forth the standard of review appropriate to a habeas corpus proceeding:

---

**1.** Also pending before the Court is petitioner's motion for immediate release based upon a recent Italian magistrate's report. That motion will be addressed in a separate opinion.

**2.** Treaty of Extradition, Oct. 13, 1983, United States–Italy, T.I.A.S. No. 10837.

It is not a means for rehearing what the magistrate already has decided. The alleged fugitive from justice has had his hearing and habeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offence charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty.

*Id.* at 312, 45 S.Ct. at 512. Since *Fernandez,* however, the Seventh Circuit has broadened the scope of review to reflect parallel developments in the scope of non-extradition habeas corpus review. In *David v. Attorney–General,* 699 F.2d 411 (7th Cir.), *cert. denied,* 464 U.S. 832, 104 S.Ct. 113, 78 L.Ed.2d 114 (1983), the Seventh Circuit addressed a procedural due process claim in the extradition context and stated that

> there is some authority for the suggestion that the limited scope of review applies only to the extradition ruling and not to procedural issues, *see, e.g., Garcia–Guillern v. U.S.,* 450 F.2d 1189, 1191 (5th Cir.1971), ... Since it appears settled that aliens are entitled to some procedural due process rights in an extradition hearing, a habeas corpus petition would seem to be the appropriate means of enforcing those rights.

699 F.2d 415. Although the issue in *David* was not resolved because the court concluded that the denial of a continuance did not violate the petitioner's constitutional rights, the Seventh Circuit had a further opportunity to examine the appropriateness of habeas corpus review of constitutional issues in an extradition case in *In re Burt,* 737 F.2d 1477 (7th Cir.1984).

In *Burt,* the court stated that the narrow scope of *Fernandez* was to be construed "in the context of its time and in the context of subsequent development of the scope of habeas corpus review." *Id.* at 1484. The court reasoned that a broadening of the *Fernandez* standard was warranted since it reflected the Supreme Court's subsequent redefinition of the scope of habeas corpus review which had previously been tied to an examination of jurisdictional defects, but now included "an evaluation of whether the petitioner is being held in violation of any of his or her constitutional rights." *Id.* The Seventh Circuit held that "federal courts undertaking habeas corpus review of extraditions have the authority to consider not only procedural defects in the extradition procedures that are of constitutional dimension, but also the substantive conduct of the United States in undertaking its decision to extradite if such conduct violates constitutional rights." *Id.* However, although the court broadened the *Fernandez* standard to include constitutional challenges, it also recognized that successful challenges would be the exception rather than the rule:

> Generally, so long as the United States has not breached a specific promise to an accused regarding his or her extradition and bases its extradition decisions on diplomatic considerations without regard to such constitutionally impermissible factors as race, color, sex, national origin, religion, or political beliefs, and in accordance with such other exceptional constitutional limitations as may exist because of particularly attrocious [sic] procedures or punishments employed by the foreign jurisdiction, those decisions will not be disturbed.

*Id.* at 1487 (citations omitted).

In considering a habeas corpus challenge to an extradition order, therefore, the Court may inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty, and whether there was any evidence to warrant the finding of probable cause to believe the accused guilty. The petitioner may also raise a limited constitutional challenge.

The Court will first address the petitioner's objections to Magistrate Rosemond's determination on remand of the status of the warrants pending in this extradition case, and will then turn to Esposito's habeas corpus arguments, which concern probable cause and constitutional issues.

### III. WARRANTS

While Esposito's petition for a writ of habeas corpus was pending before the

Court, the government and the petitioner filed numerous inconsistent and often contradictory notices and briefs which raised questions concerning the status of the Italian warrants in force against Esposito. Because this Court reviews only certain legal issues and does not make factual determinations when considering a habeas corpus petition in an extradition context, the Court remanded the matter to the magistrate for resolution of the following questions:

1) which warrants formed the basis of his finding of the petitioner's extraditability;

2) whether those warrants remain in force;

3) the effect of any change in the status of the warrants on his finding that the petitioner is extraditable; and

4) if there is such a change in the status of the warrants, for which crimes is the petitioner to be extradited.

In his August 30, 1988 Order, the magistrate listed the warrants which remain valid and which form the basis of his certification of the extradition order against Esposito. These four warrants specify twelve counts of murder and one of attempted murder. The magistrate examined the notices and briefs submitted by both parties and concluded that a reasonable interpretation of the Treaty is that "the Italian Ministry of Grace and Justice retains primary responsibility for advising and assisting the United States in proceedings arising out of extradition requests." [3] He therefore accepted official notice of the status of the four warrants from that Ministry as "reasonable and reliable evidence of the same," [4] and concluded that those four warrants are still valid and pending.

■ Esposito challenged the magistrate's Order [5] on the grounds that (i) the Italian Ministry of Grace and Justice's documents were ambiguous and therefore could not be relied upon as "reasonable and reliable evidence"; (ii) the magistrate accepted the "opening statement" of the government as fact and ignored the petitioner's contentions and exhibits; and (iii) the murder warrants had been consolidated under warrant no. 131/A/84, and all the defendants detained under that warrant had been "released".

■ The magistrate's factual findings as to the status of the currently pending warrants are not subject to direct appeal. *Fernandez*, 268 U.S. at 312, 45 S.Ct. at 512; *Collins*, 252 U.S. at 369, 40 S.Ct. at 349; *Eain v. Wilkes*, 641 F.2d at 508; *In the Matter of Assarsson*, 635 F.2d at 1240. Nor does the matter fall within the scope of the limited habeas corpus review discussed *supra* at 1472–73; *see also Freedman*, 437 F.Supp. at 1258 (" '[a] contention that [the person whose extradition is sought] has never been properly or legally charged with a crime in accordance with the treaty is not appropriate for consideration' in habeas corpus proceedings brought to review the order of commitment.") (quoting *Garcia–Guillern v. United States*, 450 F.2d 1189, 1193 n. 1 (5th Cir.), *cert. denied*,

3. Magistrate's Order, August 30, 1988, at 6.

4. *Id.* at 7.

5. Both the magistrate and the petitioner interpreted Rule 72(a) of the Federal Rules of Civil Procedure to allow the petitioner 10 days in which to appeal the Order. Rule 72(a) provides: Nondispositive Matters. A magistrate to whom a pretrial matter not dispositive of a claim or defense of a party is referred to hear and determine shall promptly conduct such proceedings as are required and when appropriate enter into the record a written order setting forth the disposition of the matter. The district judge to whom the case is assigned shall consider objections made by the parties, provided they are served and filed within 10 days after the entry of the order, and shall modify or set aside any portion of the magistrate's order found to be clearly erroneous or contrary to law.

The magistrate's order, however, is not a "pretrial matter" within the scope of Rule 72(a), because the magistrate's order was not issued prior to the hearing and because extradition hearings are not "trials." *See Charlton v. Kelly*, 229 U.S. 447, 460, 33 S.Ct. 945, 949, 57 L.Ed. 1274 (1912) ("We are not sitting in this court on the trial of the prisoner, with power to pronounce him guilty and punish him or declare him innocent and acquit him.") The inapplicability of Rule 72(a) is also consistent with the limited review allowed by the Supreme Court in *Fernandez*. *See* discussion, *supra* at 1472–73.

405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1971)). Consequently, the petitioner's objections to the magistrate's factual determinations are raised improperly.[6]

## IV. PROBABLE CAUSE

■ In his petition for habeas corpus, Esposito first contests the sufficiency of the evidence to sustain the magistrate's finding of probable cause. The Court's scope of review on this issue is limited to a determination of whether there is "any competent evidence tending to show probable cause." *Matter of Assarsson*, 635 F.2d 1237, 1246 (7th Cir.1980) (quoting *Garcia–Guillern v. United States*, 450 F.2d 1189, 1192 (5th Cir.1971)). *See also Fernandez v. Phillips*, 268 U.S. at 312, 45 S.Ct. at 542; *Freedman v. United States*, 437 F.Supp. 1252, 1265 (N.D.Ga.1977).

The Court concludes that the magistrate's determination was supported by competent evidence. The petitioner's hearing before the magistrate lasted two days. On the first day, the government moved for admission of its official extradition documents, as required by Article X of the treaty, including Government Exhibit 2, charging and informational documents, and Government Exhibit 3, the certified English translations of those Italian documents. The evidence introduced consisted mostly of statements by "defectors" (former members of an organized criminal organization known as the Camorra), some of whom also participated in the offenses charged against Esposito. The magistrate found that the statements of Camorra collaborators, accusations of members of rival Camorra clans, and statements of the victims of the crimes, along with the corroborating physical evidence, established probable cause that Esposito committed murder and attempted murder.

Esposito challenges the admissibility and sufficiency of the government's evidence. He is particularly critical of the reliability of Pasquale Scotti's testimony. Esposito argues that the defense was never afforded the opportunity to cross-examine Scotti or his "confederates," and that the defense was only given their allegations in summary form. He states that Scotti's statements to the police and the Italian magistrate were never made under oath. He links Scotti's "special treatment" in prison (apparently including "special food, conjugal visits, and helicopter transportation all over Italy") with Scotti's alleged readiness to make false accusations against others. Esposito suggests that the Italian authorities allowed Scotti to flee, and that, because Scotti had been convicted in absentia and given a life sentence, Scotti would be unlikely to appear in court to face challenges to his testimony against Esposito.

---

6. Even if the Court were able to review the magistrate's decision, that decision would likely be upheld. First, the magistrate's deference to the Italian Ministry of Grace and Justice in an extradition matter is supported by the Treaty. Article X of the Treaty provides that "[r]equests for extradition shall be made through the diplomatic channel." Article XX mandates the support of the Department of Justice, or another country's equivalent in the case of an extradition request by that country. Because the initial request for extradition comes from the Italian Executive Branch, acting through the Ministry of Grace and Justice, and the relevant documents (including copies of the arrest warrants) are provided by that Ministry to the United States Embassy in Rome for certification, it follows that an assessment of the status of the warrants pending should also come from the Ministry.

Second, Esposito's argument that the magistrate relied on the government's "opening statement" as fact misconstrues the role of the government in an extradition hearing. In an extradition hearing, the government summarizes the evidence and charges against the accused. As long as a written summary of the evidence and charges is certified and authenticated according to the Treaty and 18 U.S.C. § 3190, the government is not required to prove the prima facie case against the accused. Questions of proof are for the Italian courts.

Finally, the petitioner argues that his contentions were ignored by the magistrate, and that the magistrate erred in finding that the warrants were not consolidated under No. 131/A/84 and that the petitioner had not thereby been released. The magistrate's August 30, 1988 Opinion considered and rejected the petitioner's arguments. The magistrate traced the history of the warrants and arrived at logical conclusions about the current status of the warrants. The Court would be unlikely to disagree with the Italian Ministry of Grace and Justice's interpretation of an Italian legal document or with its knowledge of the status of the pending warrants.

Esposito further attempts to discredit the accusations of Scotti and others, which, he claims, were instrumental in the wrongful conviction of Enzo Tortura, an Italian television personality. Finally, Esposito claims that he was not implicated by the statements of the murderers, nor was there any physical evidence to implicate him.

The proceedings before the magistrate were not in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him, but rather of the character of "preliminary examinations". *Charlton v. Kelly*, 229 U.S. 447, 460, 33 S.Ct. 945, 949, 57 L.Ed. 1274 (1912). The only evidentiary function of the extradition court is to determine whether there is sufficient evidence to justify holding a person for trial in another place. *Demjanjuk v. Petrovsky*, 776 F.2d 571, 577 (6th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986). Consequently, competent evidence for the purpose of these proceedings is not necessarily evidence competent to convict. *Fernandez*, 268 U.S. at 312, 45 S.Ct. at 542. *See, e.g., Collins v. Loisel*, 259 U.S. 309, 317, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922); *Bingham v. Bradley*, 241 U.S. 511, 517, 36 S.Ct. 634, 637, 60 L.Ed. 1136 (1916).

■ Esposito's basic contention that the government's evidence against him lacks competency or admissibility contravenes established extradition law. The admissibility of evidence in an extradition case is governed by federal law. *Matter of Assarsson*, 635 F.2d at 1245. 18 U.S.C. § 3190 provides that depositions, warrants, or other papers or copies thereof shall be admissible at the hearing if they are properly authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country. The statute also provides that the certificate of the principal diplomatic or consular officer of the United States resident in the foreign country shall be proof of such authentication.[7] A plain reading of section 3190 thus leads to the inescapable conclusion that the

documents entered by the government were admissible.

Even if section 3190 did not establish the admissibility of the documents, requiring strict adhesion to the rules of evidence would run counter to one of the primary objectives of bilateral extradition treaties: "to obviate the necessity of confronting the accused with the witnesses against him; ... [requiring] the demanding government to send its citizens to another country to institute legal proceedings would defeat the whole object of the treaty." *Zanzanian v. United States*, 729 F.2d 624, 626–27 (9th Cir.1984) (quoting *Bingham v. Bradley*, 241 U.S. at 517, 36 S.Ct. at 637). Consequently, form is not to be insisted upon beyond the requirements of safety and justice. *Fernandez*, 268 U.S. at 312, 45 S.Ct. 512; *Glucksman v. Henkel*, 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911).

Due to the relaxed standards in an extradition context, the Federal Rules of Criminal Procedure are not applicable, *see* Rule 54(b)(5), nor are the evidentiary rules of criminal litigation. *United States ex. rel. Klein v. Mulligan*, 50 F.2d 687, 688 (2d Cir.), *cert. denied*, 284 U.S. 665, 52 S.Ct. 41, 76 L.Ed. 563 (1931). Hearsay evidence is admissible, *id.*, and unsworn statements of absent witnesses may be considered. *Collins v. Loisel*, 259 U.S. at 317, 42 S.Ct. at 472. There is no inherent right to the confrontation and cross-examination of witnesses. *Bingham v. Bradley*, 241 U.S. at 517, 36 S.Ct. at 637.

Esposito relies on *Moghadam v. Republic of France*, 617 F.Supp. 777 (N.D.Cal. 1985), to support his attack on Pasquale Scotti's credibility. In *Moghadam*, the court considered and rejected the credibility of a witness who recanted her earlier inculpatory statements, which were the "only evidence of probable cause." 617 F.Supp. at 783. However, the court's finding of a lack of probable cause was predicated also on the overzealousness of the government and its frustration in not being able to find a suitable country to which Moghadam

---

**7.** The Court rejects Esposito's position that the documentary evidence was improperly certified.

*See infra* at 1479–80.

should be deported. *Id.* at 784. In this case, the testimony of Scotti is not the sole evidence, Scotti has clearly not recanted his testimony against the petitioner, the government has not shown overzealousness, nor has possible deportation been an issue in the case. The Court therefore agrees with the magistrate that *Moghadam* is inapplicable.

■ In any event, the Seventh Circuit follows the majority view that questions of credibility are not properly raised in an extradition hearing. In *Eain v. Wilkes,* 641 F.2d 504 (7th Cir.1981), the court considered the probable cause requirement in an extradition proceeding against a PLO member accused of planting a bomb and killing two people in Israel. An accomplice of the petitioner, Yasin, had made a statement inculpating himself and the petitioner. The court held that accomplice testimony "may be of particular importance in extradition cases where all the alleged criminal activity occurred in a distant country.... Yasin's statements were admissions against his own penal interest and are deemed reliable." *Id.* at 510. The petitioner's flight to the United States and change of identity permitted "an inference of his guilt." *Id.* at 511; *see Kanner v. United States,* 34 F.2d 863 (7th Cir.1929). The court agreed with the magistrate's refusal to admit statements in which Yasin and his cousin allegedly recanted their earlier statements regarding the petitioner's role in the bombing. "An accused in an extradition hearing has no right to contradict the demanding country's proof *or to pose questions of credibility as in an ordinary trial,* but only to offer evidence which explains or clarifies that proof." *Eain,* 641 F.2d at 511 (emphasis added) (citing *Shapiro v. Ferrandina,* 478 F.2d 894, 905 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973)); *but see Freedman,* 437 F.Supp. at 1256–66 ("the magistrate need not wholly ignore the credibility and reliability of the complaining witness or affiant ... the improbability or vagueness of testimony may destroy the probability of guilt.") "To do otherwise would convert the extradition

into a full-scale trial, which it is not to be." *Eain,* 641 F.2d at 511.

■ This Court follows the prescription of the *Eain* court in declining to consider the credibility and motives of the witnesses against Esposito. Such questions should properly be addressed in the Italian courts. This approach is consistent with the standard applied to extradition proceedings, which admits hearsay and unsworn testimony, but denies the petitioner the right to confront witnesses and challenge their testimony. The court finds that the testimony of Scotti, Marra, and Dionitoso, *inter alia,* corroborated by Esposito's flight and change of identity, constituted "competent evidence tending to show probable cause." *Matter of Assarsson,* 635 F.2d at 1237.

## V. POST–ARREST QUESTIONING

■ The petitioner next argues that his due process rights were violated when FBI agents questioned him after he had indicated his desire to speak to an attorney. He claims that the agents continued to ask him questions concerning his name, address, and marital status, and that this "background interrogation" was not permissible because it was reasonably likely to elicit incriminating responses. Esposito contends that the questions asked by the FBI agents enabled the government to establish his true identity, and that without the answers to those questions the government would have been unable to establish the elements of a "provisional arrest" under the Treaty. Because the identity of the accused is an element the government has to prove at an extradition hearing, Esposito asks that the extradition order be set aside because "illegally obtained evidence" was used against him.

The Court finds the petitioner's arguments unpersuasive for several reasons. First, as noted above, the Seventh Circuit has stated that the extradition decisions of lower courts will rarely be disturbed by a constitutional challenge where (1) a specific promise to the accused has not been breached; (2) the extradition decision has been based on diplomatic considerations, and not constitutionally impermissible

factors; and (3) the foreign jurisdiction does not employ particularly atrocious procedures or punishments. *Burt,* 737 F.2d at 1487. Esposito's due process challenge does not fall within any of the reviewable categories listed by the Seventh Circuit.

▮ Assuming *arguendo* that the Court may review the actions of the FBI agents, the Court does not readily accept that the Fifth Amendment guarantee against self-incrimination applies in an extradition context. The Sixth Amendment guarantee of a speedy trial does not apply to extradition proceedings because it applies only to "criminal prosecutions," and an extradition proceeding is not a "criminal prosecution." *Jhirad v. Ferrandina,* 536 F.2d 478, 485 n. 9 (2d Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976). Similarly, the Fifth Amendment guarantee against double jeopardy does not apply to extradition proceedings because it is applicable only in the event of a criminal trial, and an extradition proceeding is neither criminal nor a trial. *Collins v. Loisel,* 262 U.S. 426, 429, 43 S.Ct. 618, 619, 67 L.Ed. 1062 (1923); *United States ex. rel. Bloomfield v. Gengler,* 507 F.2d 925, 927 (2d Cir.1974).

In contrast, the Fourth Amendment has been held to be applicable to an extradition proceeding. *See Rosado v. Civiletti,* 621 F.2d 1179, 1195–96 (2d Cir.1980). The petitioner suggests that the self-incrimination clause of the Fifth Amendment is analogous to the Fourth Amendment, even though the Fifth Amendment, unlike the Fourth Amendment, specifically relates to a "criminal case".[8] The petitioner apparently argues that the self-incrimination clause and the prohibition against unlawful searches and seizures both guard against the unlawful gathering of incriminating evidence. He further contends that the double jeopardy clause's inapplicability to ex-

tradition proceedings should not be extended to the self-incrimination clause because only the former is concerned "with the charges against an individual." However, the petitioner has not supported these arguments with any authority, nor is the Court aware of any. Consequently, the Court rejects the petitioner's arguments and interprets the language of the self-incrimination clause as written.

▮ Even if the Fifth Amendment were to apply to Esposito's arrest and subsequent questioning, the background questioning would not exceed constitutional limits. The petitioner compares his interrogation to that of the accused in *United States v. Hinckley,* 672 F.2d 115 (D.C.Cir.1982). In *Hinckley,* the accused was arrested and informed of his *Miranda* rights. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). After he requested his attorney, he agreed to answer some "background questions," including specific questions about his name and date of birth, and general questions about the trips he had taken the previous year and psychiatric treatment he had undergone. After Hinckley asked that the questioning stop, another agent started to ask him about his "girlfriend," and he discussed his infatuation with the actress Jodie Foster. The questioning lasted 25 minutes.

The court ruled that the questioning went beyond a routine "booking" and that it constituted a custodial interrogation contrary to both *Miranda* and *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). 672 F.2d at 123. There was a clear investigatory purpose and the agents knew, or should have known, that the questions were designed to elicit an incriminating response. *Id.* at 123–24. Stating that the agents must have been aware of a possible insanity defense, and that the period of questioning would be

**8.** "No person ... shall be compelled *in any criminal case* to be a witness against himself." U.S. Const. Amend. V. (Emphasis added.)

The Court recognizes that the Fifth Amendment guarantee against self-incrimination may properly be invoked by a party in a civil proceeding where a statement or answer may be used against the party at a later date in a crimi-

nal case for crimes against the United States or the several states. *McCarthy v. Arndstein,* 266 U.S. 34, 40, 45 S.Ct. 16, 17, 69 L.Ed. 158 (1924). However, the privilege has not been broadened to encompass crimes against the laws of a foreign nation. *See In Re Parker,* 411 F.2d 1067 (10th Cir.1969), *vacated as moot,* 397 U.S. 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970).

useful to amass demeanor evidence, the court affirmed the lower court's grant of a motion to suppress. *Id.* at 124–26.

■ In the case at bar, the questions asked by the FBI agents were typical of administrative processing of a person in custody. The agents asked the petitioner about his name, address, and family. The extended interrogation about personal relationships, psychiatric history, and past travel plans in *Hinckley* was clearly of a different order. *Cf. United States v. Regilio,* 669 F.2d 1169, 1177 (7th Cir.1981) ("Despite the breadth of the language used in *Miranda,* the Supreme Court was concerned with protecting the suspect against interrogation of an investigative nature rather than the obtaining of basic identifying data required for booking and arraignment."), *cert. denied,* 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982). The court cannot divine a pervasive investigatory purpose in the questions asked of the petitioner after his arrest and before the arrival of his attorney.[9]

## VI. CERTIFICATION OF THE GOVERNMENT'S DOCUMENTS

■ The petitioner asserts that Italy's documents were improperly certified and therefore inadmissible. He claims that they were authenticated under the Treaty of The Hague and were intended purely for European use, and that they were therefore not authenticated under the extradi-

tion treaty with Italy. He admits that the documentary evidence was certified by the United States Ambassador to Italy, but claims that this certification was merely a "rubber stamp" of the authentication under the Treaty of The Hague.[10]

The Court disagrees with the petitioner's assertions. Article X of the extradition treaty provides:

> 7. The documents which accompany an extradition request shall be admissible into evidence when: ... (b) in the case of a request from Italy, they are signed by a judge or other Italian judicial authority and are certified by the principal diplomatic or consular officer of the United States in Italy.

18 U.S.C. § 3190 provides:

> Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and *the certificate of the principal diplomtic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.* (Emphasis added.)

---

9. Even if the Court found that an abuse had taken place, the correct remedy in this case would be suppression of the "fruits," not release from custody and vacation of the extradition certification order as requested by the petitioner. Courts have been reluctant to impose such sanctions on the basis that the illegal conduct of authorities in the United States should not penalize the requesting country, which has done nothing wrong, and that sanctions against the U.S. authorities would not serve a deterrent effect. *See David v. Attorney General,* 699 F.2d at 414–5; *Romeo v. Roache,* 820 F.2d 540, 544–45 (1st Cir.1987); *Simmons v. Braun,* 627 F.2d 635 (2d Cir.1980); *Magisano v. Locke,* 545 F.2d 1228 (9th Cir.1976). In this case, suppression of the "fruits" of the questioning probably would not have affected the outcome of the identity hearing, because the Italian National Police had provided the FBI with a photograph and finger-

prints obtained when Esposito was arrested in Italy in 1971.

10. Esposito's contentions about the certification under the Treaty of The Hague are entirely specious. This Treaty, entitled the Convention Abolishing the Requirement of Legislation for Foreign Public Documents, Oct. 5, 1961, T.I.A.S. 10072, merely prescribes a consistent and less complicated method of certifying documents, involving a specific form of cachet. It does not limit the certification to specific countries. Moreover, contrary to Esposito's claim that the treaty is one "between European countries that does not involve the United States," the Convention is a multilateral agreement which entered into force in the United States on October 15, 1981.

The language of the applicable treaty and statute is clear, and the Court does not need to venture beyond that language. Because Esposito does not dispute that the Italian extradition documents were certified by the United States ambassador to Italy, they were authenticated and are admissible under Section 3190. *See Matter of Assarsson,* 635 F.2d at 1246 (certification of United States diplomatic officials is conclusive proof that the document is "properly and legally" authenticated and thus admissible) (quoting *Shapiro v. Ferrandina,* 478 F.2d 894, 904 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973)); *Cucuzzella v. Kelikoa,* 638 F.2d 105, 106–07 (9th Cir.1981); *Escobedo v. United States,* 623 F.2d 1098, 1103 (5th Cir.), *cert. denied,* 449 U.S. 1036, 101 S.Ct. 612, 66 L.Ed.2d 497 (1980); *In re Demjanjuk,* 612 F.Supp. 544, 548 (N.D.Ohio 1985).

## VII. ITALIAN JUDICIAL SYSTEM

■ The petitioner argues that he should not be extradited to Italy because the present state of the Italian court system "violates all American notions of due process, decency and human rights." He claims that the accused in Italy has no right to cross-examine his accusers consistent with the Sixth Amendment, and that therefore he would be unable to confront his adverse witnesses. He cites to an Italian newspaper, *L'Espresso,* to support further claims that the European Court of Human Rights has issued three judgments against Italy "due to the extreme length of the Italian legal proceedings," that the Italian police repeatedly arrest and release innocent people, and that they use beatings and forced ingestion of salt water.

The Supreme Court has held that where extradition is sought pursuant to a valid treaty, the petitioner cannot prevent his extradition simply by alleging that the criminal process he will receive from the foreign country fails to accord with constitutional guarantees. *See Neely v. Henkel,* 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901); *Holmes v. Laird,* 459 F.2d 1211 (D.C.Cir.1972). The Court in *Neeley* wrote that the proceedings in a foreign land are not to be tested by the constitutional safeguards prevailing in the United States, because those safeguards "have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country." *Id.* 180 U.S. at 123, 21 S.Ct. at 307. Moreover, even an American citizen[11] "who commits a crime in a foreign country cannot complain if required to submit to such modes of trial and to such punishment as the laws of that country may prescribe for its own people, unless a different mode be provided for by treaty stipulations." *Id.* Consequently, where the petitioner challenges the fairness of foreign process, courts "are bound by the existence of an extradition treaty to assume that the trial will be fair." *Rosado v. Civiletti,* 621 F.2d 1179, 1195 (2d Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980) (quoting *Glucksman v. Henkel,* 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1911)).

Nevertheless, the Supreme Court in *Neeley* did provide minimal safeguards to ensure a fair trial in the foreign court[12], and the Seventh Circuit has stated that it will consider "such other exceptional constitutional limitations as may exist because of particularly attrocious [sic] procedures or punishments employed by the foreign jurisdiction" when addressing a habeas corpus petition. *Burt,* 737 F.2d at 1487; *see also Rosado,* 621 F.2d at 1197–98 (petitioner incarcerated under federal authority pursuant to a foreign conviction cannot be denied all access to a United States court when he or she presents a persuasive showing that the conviction was obtained without the benefit of any due process whatsoever); *Gallina v. Fraser,* 278 F.2d 77, 79 (2d Cir.1960) (presumption of fairness routinely accorded the criminal process of a foreign

---

**11.** Any constitutional safeguards would arguably be even less in this case because the petitioner is not an American citizen, but an illegal alien who entered the United States under a false name.

**12.** The foreign trial must be "without discrimination against the accused because of his American citizenship." 109 U.S. at 123, 21 S.Ct. at 307.

sovereign may require closer scrutiny if a petitioner persuasively demonstrates that extradition would expose him to procedures or punishments "antipathetic to a federal court's sense of decency"), *cert. denied,* 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960).

Esposito compares the Italian criminal justice system to the Mexican system examined in *Rosado, supra.* The Court, however, agrees with the magistrate that the petitioner's reliance on that case is misplaced. In *Rosado,* the petitioners were arrested, tried and convicted in Mexico for narcotic offenses, and then transferred pursuant to a treaty to a United States prison to serve the remainder of their sentences. The petitioners challenged their detention in federal jail, claiming that they had been convicted without any due process. The court listed the violations of due process (as seen through American eyes): the petitioners did not receive assistance of counsel; they did not appear before the judge who tried their case; they could not address the charges they faced, nor could they present any evidence; Rosado was not allowed to confront the witnesses against him; his co-defendants could not cross-examine their accusers; the legal secretary demanded bribes; and they were repeatedly tortured with electric current while in jail. The court concluded that the petitioners had a right to test the basis for their continued confinement in the United States as a result of the long list of deprivations.[13] The right to cross-examine the accusers was just one of totality of reasons for the court's decision, and would not in itself have been sufficient.[14] The court wrote:

> In reaching this conclusion, we by no means imply that each element of due process as known to American criminal law must be present in a foreign criminal proceeding before Congress may give a

conviction rendered by a foreign tribunal binding effect. Indeed, we are keenly sensitive to the historical and cultural limitations of our own constitutional heritage, and respect the similarly indigenous underpinnings of the process accorded criminal defendants abroad.

621 F.2d at 1197–98.

In this case, the "evidence" provided by the petitioner is not sufficient to justify his attack on the Italian criminal justice system. During the extradition hearing, the petitioner's Italian attorney, Filippo Trofino, was asked to detail the criminal proceedings in Italy by which Esposito had been convicted in absentia. Trofino described a trial in which the witnesses were cross-examined by the defense, discovery (albeit secret) had been conducted by the judges, and Trofino had made arguments to the court. In short, the proceedings he outlined were far from lacking "even the barest rudiments of a process calculated to arrive at the truth of the accusations...." *Id.* Trofino also pointed to an Italian appellate system which allows a fugitive to appeal a conviction and which had overturned an improperly obtained conviction. *Cf. Matter of Extradition of Pazienza,* 619 F.Supp. 611, 620 (D.C.N.Y.1985) ("the good faith of [the Italian] Government, and its ability to assure the Requested Party a fair trial is buttressed by the very acquittal of Vitalone [a co-defendant] relied on by [the habeas petitioner] ..."). Moreover, the Court notes that Esposito's two original convictions in absentia were quashed when the Italian court was notified that Esposito's appeal of those convictions had not been addressed within a year of his detention.

 Finally, Esposito argues that the Court should somehow take into account Italy's failure to grant the United States' request for the extradition of Abul Abbas,

---

**13.** Esposito incorrectly asserts that the habeas corpus petition in *Rosado* was successful. Although it allowed a review of the Mexican judicial system, the court ultimately denied the petition. The court held that the petitioners were estopped from arguing that their continued detention violated their due process rights where they had been transferred to the United States under a treaty and had voluntarily and intelli-

gently agreed to forego their right to challenge the validity of their convictions in Mexico. 621 F.2d at 1198–1200.

**14.** The court stated that "his conviction was obtained without the benefit of *any process whatsoever.*" *Id.* at 1198. (Emphasis added.)

a PLO member who took part in the Achille Lauro hijacking, in its decision of whether to grant his petition for habeas corpus. A similar argument was rejected by the Supreme Court in *Charlton v. Kelly*, 229 U.S. 447, 469–76, 33 S.Ct. 945, 955, 57 L.Ed. 1274 (1913), and more recently by other circuits in *Peroff v. Hylton*, 563 F.2d 1099, 1102 (4th Cir.1977) and *Escobedo*, 623 F.2d at 1107. The question of whether the United States should refuse to extradite Esposito because of Italy's failure to reciprocate is one for the Executive Branch, and not the Judiciary, to decide. *Escobedo v. United States*, 623 F.2d at 1107.[15]

## VIII. CONCLUSION

For the foregoing reasons, the petitioner's request for the issuance of a writ of habeas corpus is denied.

Philip C. Parenti, Chicago, Ill., for defendant.

---

**15.** Neither the magistrate's order nor the Court's rejection of Esposito's petition leads directly to Esposito's extradition. "The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct foreign affairs." *Escobe-* do, 623 F.2d at 1105; *Wacker v. Bisson*, 348 F.2d 602, 606 (5th Cir.1965) ("Review by habeas corpus ... tests only the legality of the extradition proceedings; the question of the wisdom of extradition remains for the Executive Branch to decide.")